IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LEONARDO PIÑON,

        Petitioner,

vs.                                              No. CIV 06-686 MV/LFG

ROBERT ULIBARRI,

        Respondent.

## MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDED DISPOSITION[1]

### Findings

1.  This is a proceeding on a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed August 2, 2006. Petitioner Leonardo Piñon ("Piñon"), proceeding with counsel, challenges the judgment and sentence entered by the Fifth Judicial District Court in State v. Piñon, No. CR 2003-92 (County of Lea, New Mexico).

2.  Respondent filed an Answer [Doc. 7] and a Motion to Dismiss Petition with Prejudice [Doc. 4], accompanied by a memorandum in support. Petitioner filed his Response [Doc. 9] to the motion to dismiss on October 23, 2006. Respondent did not file a Reply. The Motion to Dismiss is now fully briefed. For the reasons given below, the Court recommends that the Motion to Dismiss be granted.

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

<u>Factual and Procedural Background</u>

3.  Piñon pled not guilty and was convicted following a jury trial on four counts of distributing cocaine, in violation of N.M.S.A. (1978) § 30-31-20.  The court also found that Piñon was an habitual offender with one prior felony conviction.  Judgment and Sentence was entered on October 29, 2003.  Piñon was sentenced to nine years, enhanced by one year for the habitual offender status, on each count.  The sentences were to run concurrently, followed by two years of parole, resulting in a total period of incarceration of ten years.

4.  Piñon appealed his conviction.  The New Mexico Court of Appeals proposed summary affirmance and Piñon, through counsel, filed a detailed brief in opposition.  The Court of Appeals affirmed the conviction on June 11, 2004.  The New Mexico Supreme Court denied Piñon's petition for certiorari review on July 12, 2004.

5.  Piñon thereafter filed a petition for habeas corpus relief in the state district court.  The district court denied the petition, and Piñon sought certiorari in the New Mexico Supreme Court.  The supreme court granted the writ on May 2, 2006 and remanded the case to district court for an evidentiary hearing on the issues of entrapment and ineffective assistance of counsel.

6.  The district judge conducted an evidentiary hearing, and on June 14, 2006 entered a second order denying habeas relief.  Piñon again sought certiorari with the New Mexico Supreme Court, and the court denied review on July 26, 2006.  Piñon has exhausted his state remedies.

7.  Piñon filed this federal habeas corpus petition on August 2, 2006.  As grounds for relief, Piñon alleges his trial counsel was ineffective in several different ways, as follows:

I.  Counsel abandoned Defendant during a period of cooperation with prosecutors.

II.  Counsel failed to investigate a claim of entrapment.

2

III.  Counsel failed to communicate with Defendant.

IV.  Counsel failed to pursue five pretrial motions, as follows:

      a.  Failed to object to pre-indictment delay;
      b.  Failed to enforce a non-prosecution agreement;
      c.  Failed to file a motion to reveal the identity of confidential informant;
      d.  Failed to object to a deficient chain of custody;
      e.  Failed to make Batson objections.

V.  Counsel failed to present a defense of entrapment.

VI.  Counsel did not allow Defendant to testify at trial.

VII.  Cumulative error.

8.  Respondent contends that each of these claims of ineffective assistance of counsel was reviewed, addressed and rejected by the state courts in habeas proceedings, the results of which were reasonable and in keeping with federal law.   The Court agrees that all of the claims now raised by Piñon in his federal habeas petition were raised and decided adversely to him in the state habeas proceeding, that there is no ground for federal habeas relief, and Respondent's motion to dismiss should be granted.

<u>Discussion</u>

9.  Piñon's sole claim in this proceeding is that his trial attorney was constitutionally ineffective.  He cites numerous instances of ineffectiveness, all of which were raised and rejected in the state courts.

10.  To establish ineffective assistance of counsel, Piñon must make a two-pronged showing: (1) that counsel's performance was constitutionally defective; and (2) that the deficient performance prejudiced the defense in that counsel's errors were so serious as to deprive the defendant of a fair trial with a reliable result.  Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052 (1984).

3

11. To prove deficient performance, Piñon must overcome the presumption that counsel's conduct was constitutionally effective. Duvall v. Reynolds, 139 F.3d 768, 777 (10th Cir. 1998). Scrutiny of counsel's performance must be highly deferential and must avoid the distorting effects of hindsight. Miles v. Dorsey, 61 F.3d 1459, 1474 (10th Cir. 1995). In order to be found constitutionally ineffective, trial counsel's performance must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy. Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997).

12. To prove that counsel's performance was prejudicial to his defense, Piñon must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, *supra*, 466 U.S. at 694. The court may address the performance and prejudice components in any order and need not address both if Petitioner fails to make the requisite showing for one of the elements. Id., at 697.

13. As noted above, all of the claims of ineffectiveness now raised by Piñon in his federal petition were previously raised and rejected by the state courts, in the course of deciding his petition for state habeas relief. Because Piñon filed his federal habeas petition after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), this court is precluded from granting habeas relief on any claim that was adjudicated on the merits by the state courts, unless the state proceeding resulted in a decision that is contrary to or involves an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495 (2000); Smallwood v. Gibson, 191 F.3d 1257, 1264-65 (10th Cir. 1999).

14. Piñon asserts that the state court determination was not a true "adjudication on the merits" or, alternatively, if it was an adjudication on the merits, it failed to meet the reasonableness test of <u>Williams v. Taylor</u>. He argues that, because the decision was not a true merits adjudication, the federal court may not apply the deferential standard of <u>Williams</u> but must instead apply pre-AEDPA standards in this habeas proceeding – that is, the Court must conduct a *de novo* review of the state court decision without the increased deference required by AEDPA.

15. The Court finds that the state courts' determinations on the multiple claims of ineffective assistance of counsel did indeed constitute adjudications on the merits. Further, the state courts' decisions as to each ground of alleged ineffectiveness were not contrary to nor did they involve an unreasonable application of federal law, and were not based on unreasonable determinations of the facts in light of the evidence, under the test of <u>Williams v. Taylor</u>, *supra*, and 28 U.S.C. § 2254(d).

16. With respect to the claims of ineffective assistance, Piñon asserts that the state habeas decision was contrary to federal law, in that the court required him to "demonstrate proof of a different result [had counsel performed adequately], rather than simply providing sufficient evidence to undermine the Court's confidence in the outcome of the proceeding." [Doc. 9, at 2].

17. The Court rejects this assertion. In its opinion denying habeas relief, the state court correctly stated the appropriate standard for <u>Strickland</u>'s second prong, as follows: "To prevail, Defendant must show that Mr. Williamson's representation was objectively unreasonable and that absent counsel's errors, there is a reasonable probability that the outcome of the trial would have been different." [Doc. 7, Ex. Q at 1]. The state court did not impermissibly require Piñon to prove that the outcome would have been different but for counsel's alleged errors. Nor did the state court apply a higher standard than that of "reasonable probability," which is the inquiry mandated by federal law.

5

18.  Following a brief discussion of the issue of whether the state court's habeas decision was a true "adjudication on the merits," each ground of alleged ineffectiveness asserted by Piñon will be addressed separately below.

The Claim of Ineffective Assistance of Counsel Was
"Adjudicated on the Merits" by the State Courts

19.  Piñon argues that the state court rulings were not adjudicated on the merits within the meaning of AEDPA, because the state district judge did not cite federal law in his decision and therefore denied the petition "without any consideration of controlling federal authority." [Doc. 9, at 1].  He describes the decision of the state district court, which denied his application for habeas relief following an evidentiary hearing, as a "summary denial" [Id.] and argues that the state court "never clearly explained its reasoning in a decision based on federal constitutional law."  [Id., at 5].

20.  Piñon seeks to impose a burden on the state court not required by federal law.  The Tenth Circuit has never required that a state court cite federal authority in order that the decision be considered an "adjudication on the merits" within the meaning of AEDPA.  The leading case in the Tenth Circuit on this issue, Aycox v. Lytle, 196 F.3d 1174 (10th Cir. 1999), involved an opinion by the New Mexico state court denying the petitioner's state habeas petition in a summary order of dismissal.  The order "simply provided that 'as a matter of law, Petitioner is not entitled to relief,'" and the state supreme court subsequently denied the petitioner's request for certiorari without any analysis.  Id., at 1177.  The Tenth Circuit held:

> We have stated that the deferential post-AEDPA standard does not apply where the state court did not decide a claim on its merits. See, e.g., Moore v. Gibson, 195 F.3d 1152, 1162 (10th Cir.1999) . . . [in which] we assumed that the Oklahoma Court of Criminal Appeals had

6

reached a decision "on the merits" of a prosecutorial misconduct claim, even though that court failed to mention the federal basis for the claim and failed to cite any state or federal law in support of its conclusion that the misconduct did not warrant reversal or modification . . . .   Other circuits have clearly held that a summary decision without even the cursory reasoning found in Moore also can constitute an "adjudication on the merits" for purposes of § 2254(d), provided that the decision was reached on substantive rather than procedural grounds [citing cases from the Fourth and Fifth Circuits holding that a decision stating only that the court "find[s] no merit" in certain claims, and another one-word denial of postconviction relief, to be adjudications on the merits] . . . .

There is no evidence here that the state court did not consider and reach the merits of Aycox's claim. Since we have an adjudication on the merits, we must consider what it means to defer to a decision which does not articulate a reasoned application of federal law to determined facts. We conclude, for reasons that follow, that we owe deference to the state court's *result*, even if its reasoning is not expressly stated.

Aycox v. Lytle, *supra*, at 1177 (emphasis in original).

21.  Aycox v. Lytle is still good law; indeed, the Tenth Circuit has never backed away from the rule that it will apply AEDPA deference to a state court decision even if the reasoning is not expressly stated, and that the federal courts "must uphold the state court's summary decision unless our independent review of the record and pertinent federal law persuades us that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented."  Id., at 1178.  The Tenth Circuit went on to say that this "'independent review' should be distinguished from a full *de novo* review of the petitioner's claims . . . .  Our review is in fact deferential because we cannot grant relief unless the state court's result is legally or factually unreasonable . . . .  [W]hen presented with a summary disposition, as we are here, we will do our best under the standard of review mandated by AEDPA." Aycox v. Lytle, *supra*, at 1178 & n.3.

22.  The initial decision of the state district court on Piñon's habeas petition was a short, summary disposition, similar to the one at issue in <u>Aycox</u>.  However, Piñon was granted his application for a writ of certiorari, and the petition was sent back for an evidentiary hearing.  As directed by the state supreme court, the state district court held an evidentiary hearing, after which it issued a detailed, five-page analysis discussing each issue raised in the petition.  [Doc. 7, Ex. Q].

23.  These are the identical issues which Piñon now raises in this federal petition.  The state court decision following the evidentiary hearing was not based on procedural grounds; rather, each issue was discussed and decided on the merits.  Based on <u>Aycox</u> and its progeny, it is not necessary that the state court actually cite federal Supreme Court case law in order that the decision be "adjudicated on the merits."   <u>Gipson v. Jordan</u>, 376 F.3d 1193, 1196 n.1 (10th Cir. 2004) ("the Supreme Court . . . made clear that under AEDPA there is no requirement that the state court cite or even be aware of Supreme Court cases 'so long as neither the reasoning nor the result of the state-court decision contradicts them'").

24.  The Court finds that each of the issues raised by Piñon in his federal habeas petition was indeed "adjudicated on the merits" by the state courts, thus triggering the deferential AEDPA standard.  The Court now turns to the specific instances which Piñon alleges as grounds for his claim of ineffective assistance of counsel.

<u>Abandonment of Defendant During a Period of Cooperation</u>

25.  As factual basis for this claim, Piñon alleges as follows:

26.  Piñon was arrested in 2003 on charges of trafficking in narcotics, based on events occurring in September 2001.  Assistant Public Defender Glen Williamson ("Williamson") was appointed to represent Piñon and, in spite of Piñon's assertions that he was entrapped into

involvement with drug dealing, counsel advised him that he could only avoid criminal liability by cooperating with the District Attorney's office in their investigation and prosecution of other drug cases. Piñon agreed to do so. Piñon says that he was told by an Assistant District Attorney that if he produced eight drug dealers who could be successfully prosecuted, the State would agree to a one-year sentence in the county jail. [Doc. 1, at 6-7].

27. After Piñon agreed to cooperate, Williamson told him to maintain contact with the District Attorney's office and to work with Agents Jimenez and Wiskowski. Piñon says he met repeatedly with prosecution authorities but, despite consistent efforts, was unable to produce the eight drug dealers as requested. He ultimately received no concessions from the District Attorney. Piñon says he received little or no assistance from Williamson during the period he was attempting to render assistance to the State. He asserts that his attorney failed to properly assist him in cooperating with the prosecution authorities, failed to properly manage his attempts to cooperate with the State, and essentially abandoned him during a critical stage of the proceedings. He contends that counsel's neglect ultimately resulted in the prosecution's decision to file criminal charges without any concessions. [Doc. 1, at 7-8, 14].

28. This issue was raised in Piñon's state habeas petition. [Doc. 7, Ex. J, at 6-7, 13-14]. After an evidentiary hearing, the state district court made the following findings and conclusions relevant to this claim:

> 4) Counsel tried to negotiate a resolution to the case by entering into a non-prosecution agreement with the District Attorney. However, no meeting of the minds was achieved and no agreement was consummated. There was no agreement to be enforced. If there was some sort of informal understanding that Defendant could "work off" his charges, it is undisputed that Defendant did nothing to hold up his end of the bargain and hence there was a failure of consideration

on his part.

    5)  The circumstances around the attempt to negotiate a non-prosecution agreement were, in large part, the reason why this case languished so long in the Magistrate Court (from August 2002 until February 2003).   During this time, Counsel obtained Defendant's release from jail in August 2002, a benefit which Defendant greatly desired.  Further, Defendant has shown no prejudice from this delay.

    6)  Counsel was in reasonable contact with Defendant during the pre-trial period.   Defendant was free to contact Counsel at his pleasure.  Under the terms of his release, he was to stay in contact with his attorney.  He could have scheduled even more visits with Counsel if he desired.  He could have placed his claimed witnesses in contact with Counsel.  The Defendant bears some responsibility for his own defense.  Counsel did not abandon the Defendant nor fail to stay in reasonable communication with the Defendant.

[Doc. 7, Ex. Q, at 2-3].

29.  Piñon argues that the right to counsel applies at all critical stages of the proceedings,

<u>Kirby v. Illinois</u>, 406 U.S. 682, 690, 92 S. Ct. 1877 (1972), and that a "critical stage" is one which

is essentially adversarial and in which the defendant may be prejudiced in some significant way by the

absence of counsel.  <u>United States v. Wade</u>, 388 U.S. 218, 227, 87 S. Ct. 1926 (1967).  Piñon cites

<u>United States v. Leonti</u>, 326 F.3d 1111, 1117 (9th Cir. 2003) for the proposition that an attorney's

failure to properly assist a defendant in cooperating with the government can support a claim of

ineffective assistance of counsel.

30.  The <u>Leonti</u> case arose in the context of a defendant's attempts to obtain a downward

departure from his federal sentence for substantial assistance pursuant to U.S.S.G. 5K1.1.  The Ninth

Circuit emphasized the importance of the cooperation stage of federal criminal proceedings, in light

of the Sentencing Guidelines scheme, even in the post-mandatory Guidelines era:

    for many federal defendants, such as Leonti, the only hope of mitigating the often harsh effects of the sentencing guidelines is cooperation with the government . . . .  [The district court in] <u>United</u>

10

States v. Fernandez, 2000 WL 534449 (S.D.N.Y. [2000]), found ineffective assistance where an attorney failed to advise a defendant of the importance of cooperating with the government early in the case. Id. at *2. In addressing this claim, the court emphasized the centrality of cooperation under the Guidelines regime, as follows:

"Anyone who has practiced as a criminal defense lawyer in federal cases since the effective date of the Guidelines knows the importance of a 5K1.1 letter···· [T]he advent of the Sentencing Guidelines now makes it mandatory that every defendant be advised at an early stage that cooperation with the Government may be the only course that can substantially reduce the sentence that will ultimately be imposed."

United States v. Leonti, *supra*, at 1118 & n.2.

31.  The present case did not arise under the federal Sentencing Guidelines and did not involve a federal defendant who was attempting to obtain the specific concession, established in the federal scheme, of a downward departure for substantial assistance.  Rather, in Piñon's case, his attorney negotiated a possible sentencing concession from state officials, if Piñon would be willing and able to assist the officials in prosecution of other drug cases.  Counsel obtained Piñon's release from jail on the strength of this potential deal.  In the end, Piñon was not willing or able to provide the assistance required for the concession, and the concession was not made.  Piñon does not explain how any actions by his attorney could have prevented this result; in contrast, it was undisputed in the Leonti case that the defendant "had substantial assistance to provide the government and that, but for his counsel's error, his cooperation would have resulted in a recommendation of a lower sentence," as described in United States v. Carver, 179 Fed. Appx. 276, 280 (6th Cir. 2006).

32.  This Court does not find that the state habeas court's determination on this issue was unreasonable or out of step with federal law.  Even if the period between August 2002 and February 2003 – the months when Piñon was working with the District Attorney's office in an attempt to

obtain a concession – were considered to be a "critical stage," the state court was not unreasonable in concluding that counsel did not abandon Piñon during this stage. Counsel negotiated Piñon's release from jail and provided an opportunity for him to take actions which had the potential to benefit his case. It was Piñon's responsibility to avail himself of the opportunity, and he was either unwilling or unable to do so.

33. The state court concluded that Williamson was available to Piñon throughout this period. There is no allegation that Williamson failed to return phone calls, or refused any request by Piñon to attend meetings at the District Attorney's office, or failed to convey information to the D.A. Piñon does not explain what his attorney failed to do during this period which, to a reasonable probability, would have resulted in Piñon obtaining the potential concession which counsel negotiated for him. It was reasonable for the district court to conclude that the ultimate failure of the potential concession agreement was due to Piñon's inability or unwillingness to fulfill the terms of the potential agreement, not because of anything his attorney did or did not do.

34. Federal habeas relief is not available on the claim that counsel abandoned his client during a critical phase of the proceedings.

<u>Failure to Investigate and Adequately Present a Defense of Entrapment</u>

35. Piñon's second and fifth claims for federal habeas relief are that his attorney failed to thoroughly investigate his claim of entrapment, and thereafter failed to present an adequate defense of entrapment at trial. As the factual basis for this claim, Piñon alleges as follows:

36. Piñon asserts he did not deal in narcotics but was hounded and persuaded, against his will, to commit the drug trafficking acts for which he was convicted. He alleges that Ray Hernandez ("Hernandez"), an acquaintance of his, approached him one day and asked whether he sold marijuana

12

or cocaine.  When Piñon said no, Hernandez persisted in asking Piñon to sell him drugs and "simply would not accept no for an answer."  [Doc. 1, at 4].  Hernandez asked Piñon whether he knew an individual named "Canu" and when Piñon said yes, Hernandez repeatedly asked Piñon to go with him to Canu's house and ask Canu to sell drugs to Hernandez.  Hernandez suggested they go in his truck with his friends from college, who in reality were undercover drug agents.  [Id., at 4-5].

37.  Piñon contends that he felt "the only way to make Mr. Hernandez and the Agents go away was to acquiesce in their persistent demands," so he agreed to go with the three of them to a drug dealer's house.  [Id., at 5].  At the drug dealer's house, Piñon took $100 from Hernandez, purchased five rocks of crack cocaine, and handed them to Hernandez and the agents.  Piñon believes that Hernandez is the unidentified confidential informant in the case and that Hernandez was under pressure to produce a quota of additional drug dealers for the prosecution, "no matter how tenuous their connection to the drug trade."  [Id.].

38.  The day after the first drug sale, the two agents returned to Piñon's home and asked him to get more drugs for them.  He says he "reminded them that he did not deal drugs" but nevertheless relented after about 15 minutes of pressure and went back to the drug dealer's house and bought $100 worth of crack cocaine for the agents.  [Id., at 5-6].

39.  The same pattern occurred four days later when, after fifteen to twenty minutes of what Piñon describes as begging, pleading and "badgering," Piñon says he relented and again purchased $100 of cocaine for the two agents.  [Id., at 6].

40.  Three days after the third sale, one of the agents again appeared at Piñon's door, accompanied by two other persons who were unknown to Piñon but who turned out to be agents as well, and asked Piñon to purchase narcotics for them.  Piñon says he became angry, told the agents

13

he was not involved in any type of drug activity or drug dealing, and that he did not want Hernandez and his friends coming around any more. He told the agents he would help them purchase narcotics if they promised they would never come back to his house. He says they agreed, and he then purchased $100 of crack cocaine for the agents for the last time. [Id.]. It was not until two years later that Piñon was arrested in an area-wide crime sweep and charged with four counts of trafficking in cocaine. [Id., at 6-7].

41.   Piñon alleges further that after the arrest, he explained to appointed counsel Williamson that he was simply living his life as a good father when undercover narcotics agents came to his house and persisted in asking him to buy drugs. He says he simply acquiesced in helping them, because he feared they would not leave him and his family alone unless he did what they asked him to do. He told his lawyer that he felt "harassed, persuaded and intimidated" to commit the offenses, but in spite of these revelations, Williamson never conducted any independent defense investigation to confirm Piñon's claims.

42.   On the date set for trial, Williamson filed a motion to dismiss the case based on governmental misconduct. Counsel argued that, as a matter of law, the police conduct exceeded the standards of proper investigation, that Piñon was not predisposed to commit the charged offenses, and that the police misconduct created a substantial risk that an ordinary person in these circumstances would have been induced to commit the crimes. The motion was denied. [Id., at 8].

43.   Counsel also filed a motion asking the court to permit Piñon to testify without being impeached by his prior felony convictions, arguing that, if the impeachment were disallowed, Piñon would testify in his own defense about the circumstances of the alleged entrapment. This motion was also denied. [Id., at 8-9].

14

44.   Piñon argues that his attorney failed to fulfill his duty to conduct a reasonable investigation into the entrapment defense.  Piñon says that his then-wife, Annabelle Piñon, and his brother Andy Piñon were witnesses to the agents' inducements and could have testified that the undercover officers repeatedly arrived at the house "at all hours of the night" and waited in a threatening and intimidating manner, and that Piñon never sold drugs of any kind.  He clams that his attorney never contacted these "central defense witnesses" and did not present their testimony at trial.  [Id., at 16].

45.   In addition, Piñon faults his counsel for failing to introduce evidence at trial in support of the defense of entrapment.  He states that his attorney never interviewed Annabelle or Andy Piñon and presented no evidence in defense of the charges.  [Doc. 1, at 25-26].

46.   Piñon raised the issue of ineffectiveness with respect to the entrapment defense in his state habeas petition.  [Doc. J, at 14-17, 28-29].  The district judge made the following findings and conclusions on this claim, after conducting an evidentiary hearing:

> 2)   Defendant claims that counsel should have raised entrapment as a defense.
>
> Counsel did raise the defense of entrapment by motion to dismiss. Although the Court denied the motion, the Court carefully listened to the trial testimony of the State's witnesses as well as Counsel's vigorous cross-examination of them.[2]  When Defendant decided not to testify, the Court, based on the evidence before it, found that there was no entrapment as a matter of law (objective entrapment). Considering Defendant's testimony at this evidentiary hearing in addition to the trial testimony, the Court finds that there was no objective or subjective entrapment.  The Court does say that if the Defendant had elected to testify, then the Court would have given Counsel's requested jury instruction on subjective entrapment to the jury for consideration [but] the Defendant decided not to testify thereby foreclosing that issue.  Defendant's wife's testimony on lack

---

[2]The judge who wrote this order is the same judge who tried the case.

of predisposition <u>by itself</u> would not have been sufficient to warrant the requested instruction.  Counsel's decision not to call her was a tactical decision since her testimony would have placed Defendant's character into issue and opened that door to the State.  Counsel instead tried to support the requested instruction by aggressively cross-examining the police.  Counsel was unsuccessful.

[Doc. 7, Ex. Q, at 1-2 (emphasis in original)].

47.  The state habeas court further found as follows:

12) Considering all of the record, all of the testimony, and all of the circumstances of this case, the Counsel's overall performance in this case was not deficient when measured against the objective standard of a reasonable attorney.  However, even if Counsel had done all of the things that Defendant claims he should have done, the evidence of Defendant's guilt overwhelms any probability of a different result.

On September 12, 2001, Defendant was approached to obtain drugs at his house by a person he vaguely knew (the CI [*i.e.*, confidential informant]) and two complete strangers.  Defendant said he had no drugs but he knew where to get some.  He took them to a drug dealer's house where he took their money, went inside, returned with drugs and gave drugs to the strangers.  On September 13, 2001, the two strangers returned (without the CI) to the Defendant's house and a nearly identical transaction occurred.

On September 17, 2001, the two strangers (without the CI) and yet another complete stranger met Defendant at his house.  On this occasion, they went to the same house and Defendant went inside to purchase drugs.  He came back out empty handed and said we'll have to come back later because "they're cooking" (making crack cocaine).  Later that day, the Defendant took the three strangers back to the drug house and purchased drugs and delivered them to the strangers.

On September 20, 2001, one of the original strangers (without the CI), the third stranger and yet another complete stranger encountered Defendant at his house.  Upon asking the Defendant for drugs, the Defendant said he would go and get them.  Defendant took their order and money and left.  Approximately twenty minutes later, Defendant returned and gave them drugs.

It is clear that Defendant was knowledgeable and well connected with other drug dealers.  He had the ability to make immediate unannounced contact and purchase quantities of drugs.  Defendant would sell them to anyone upon request including complete strangers.

16

He did so, with this limited group, four times in eight days.

There is no reasonable possibility that the jury would have reached a different result even if Counsel had done everything that the Defendant claims he should have.

[Doc. 7, Ex. Q, at 4-5].

48. Piñon's argument regarding a failure to investigate the entrapment defense rests on the assertion that counsel should have interviewed and called as witnesses Piñon's wife and brother, who would have testified as to the conduct of the police officers as well as to a lack of predisposition on Piñon's part to commit the offenses.

49. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland v. Washington, *supra*, 466 U.S. at 691.

50. It is unclear from the record whether Williamson in fact failed to interview the wife and brother, or whether he decided that their testimony would be strategically disadvantageous to Piñon. Counsel negotiated Piñon's release from jail for a six-month period after his arrest. Piñon was not prevented from bringing any potential witnesses to his attorney's attention, as might have been the case if he were incarcerated during this time. As the state habeas court noted, Piñon bears some responsibility for his own defense. In addition, it was not unreasonable for the state habeas court to make the determination that the decision not to call the wife and brother could be seen as a wise tactical move, in that their testimony could have opened the door to the prosecution to present character evidence. Fed. R. Evid. 404.

17

51. With respect to the argument that counsel failed to make an adequate presentation of the entrapment defense at trial, the state habeas court noted that counsel did, in fact, file a motion to dismiss the action based on the officers' alleged misconduct, and further attempted to raise the entrapment defense by way of "vigorous" cross examination of the officers at trial. It certainly would have helped the entrapment defense if Piñon himself had testified, but there were other valid tactical reasons for him to avoid taking the stand, as noted by the state habeas court and as discussed below in connection with the claim of ineffective assistance of counsel in refusing to permit Piñon to testify.

52. Piñon has not shown that counsel was ineffective in either his pre-trial investigation of the possible entrapment defense, nor in his handling of the issue at trial. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland v. Washington, *supra*. The state habeas court was not unreasonable in determining that counsel's performance was not constitutionally ineffective and, even if other tactics could have been used, Piñon has failed to show a reasonable probability that the outcome would have been different.

53. There is no basis for federal habeas relief as to the claims of failure to investigate, and to make an adequate presentation of, the defense of entrapment.

<u>Failure to Communicate with Defendant</u>

54. Piñon next makes a general claim that his trial attorney failed to communicate with him and thereby rendered ineffective assistance. He alleges that Williamson "never maintained any contact with Mr. Piñon, never consulted with him about the facts of the case, never solicited his help in identifying or developing potential defense witnesses and never advised Mr. Piñon of the defense strategy." [Doc. 1, at 17]. He also claims that Williamson never advised him about his right to testify

in his own defense.  [Id., at 8].

55.  This claim was raised in Piñon's state habeas petition, in the same language.  [Doc. 7, Ex. J, at 8, 17-18].  The state habeas judge who, as noted above, was the same judge who tried the case, noted in his opinion that on the morning of trial the Court advised the Defendant on the record of his right to testify or not testify, and that the Court once again advised Defendant of this right after the close of the State's case.  [Doc. 7, Ex. Q, at 1].  He also found as follows:

> 6)  Counsel was in reasonable contact with Defendant during the pre-trial period.  Defendant was free to contact Counsel at his pleasure.  Under the terms of his release, he was to stay in contact with his attorney.  He could have scheduled even more visits with Counsel if he desired.  He could have placed his claimed witnesses in contact with Counsel.  The Defendant bears some responsibility for his own defense.  Counsel did not abandon the Defendant nor fail to stay in reasonable communication with the Defendant.

[Doc. 7, Ex. Q, at 2-3].

56.  An attorney representing a person charged in a criminal matter has a duty "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution."  Strickland v. Washington, *supra*, 466 U.S. at 688.        57.  In this case, the state habeas court made a finding of fact that attorney Williamson remained in reasonable contact and communication with Piñon throughout the pre-trial period.

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).  Piñon has failed to meet that burden here.

58.  As the state court pointed out, Piñon was not incarcerated during the pretrial period.  He

could have called or gone by his counsel's office at any time during this period.  Indeed, he was obligated to stay in contact with his attorney under the terms of his release.  Piñon alleges in the most general terms that his attorney did not maintain contact with him, did not consult him about the facts of the case, did not solicit his help in identifying potential defense witnesses, and never advised him of the defense strategy.  But he does not provide any dates when, for example, he tried to contact counsel and could not reach him.  He does not allege the specifics of any attempts he may have made, which were rebuffed, to call or go by his attorney's office.  He does not describe any phone calls which went unanswered, or specific questions or concerns he raised with his attorney which went unaddressed.  This lack of specifics falls far short of clear and convincing evidence that the state court erred in making the finding that counsel remained in reasonable contact with Piñon in the pre-trial period.

59.  In addition, the state habeas court noted that the trial judge, the same judge who decided the habeas petition, advised Piñon on two separate occasions of his right to testify in his own defense. Even if counsel failed to also advise Piñon of this right, a claim that has not been established in any event, Piñon fails to show that such failure prejudiced him, given the court's repeated advice in this matter.

60.  There are no grounds for federal habeas relief on the claim of failure to communicate.

<u>Failure to Pursue Pretrial Motions</u>

61.  Piñon asserts that his attorney was ineffective in failing to file various pretrial motions which, he argues, would have had a reasonable probability of changing the outcome.  This issue was raised and decided in Piñon's state habeas petition.  [Doc. 7, Ex. J, at 18-28].  Piñon raised claims in the state court as to each of the five motions which he now asserts in his federal petition would

20

have made a difference to the outcome, and the state court discussed each of these motions.  This Court finds that the state court rulings were not unreasonable nor contrary to federal law, under the standard of <u>Williams v. Taylor</u>, *supra*.

62.   Failure to file a pretrial motion can constitute ineffective assistance of counsel. <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 106 S. Ct. 2574 (1986).  The test for prejudice in such situations is whether a reasonable probability exists that the outcome would have been different, if the motion had been made and had been successful.  <u>Id.</u>, 477 U.S. at 389.

63.   The Court examines separately each of the five motions which Piñon alleges should have been filed.

a.   *Failure to object to pre-indictment delay*

64.   Piñon asserts that his attorney was ineffective in failing to file a motion to dismiss the case based on the prosecution's delay of two years between the time of the drug sales and the time charges were brought.  He argues that the case was not complex, that the charges could have been brought earlier, and that the delay worked to his prejudice by "depriving him of the opportunity to obtain the testimony of other, available percipient witnesses who could have supported his claims of entrapment."  [Doc. 1, at 19].

65.   This claim was raised in Piñon's state petition.  The state court noted that the delay was occasioned by the attempt to negotiate a non-prosecution agreement, under which Piñon would receive concessions if he assisted in prosecuting other suspected drug dealers.  When it became apparent that Piñon was unable or unwilling to do so, the charges were then brought.   The state court found that Piñon failed to show that he was prejudiced by this delay.  [Doc. 7, Ex. Q, at 2].

66.   This conclusion is not unreasonable and does not violate federal law.  As the Supreme

Court pointed out in <u>United States v. Lovasco</u>, 431 U.S. 783, 794, 97 S. Ct. 2044 (1977), there are any number of valid reasons why a prosecutor might find it desirable to wait before bringing formal charges against a suspect, including the possibility that the prosecution may never go forward at all:

> [R]equiring the Government to make charging decisions immediately upon assembling evidence sufficient to establish guilt would preclude the Government from giving full consideration to the desirability of not prosecuting in particular cases. The decision to file criminal charges, with the awesome consequences it entails, requires consideration of a wide range of factors in addition to the strength of the Government's case, in order to determine whether prosecution would be in the public interest.

67.  The Supreme Court noted in <u>Lovasco</u> that a prosecutor is not obliged to present all charges which the evidence might support and may exercise discretion to decline to prosecute if, for example, the accused is cooperating in the apprehension or conviction of others.  <u>Id.</u>, at 794 n.15. That is what occurred in this case.  Piñon was offered a chance to cooperate which, if he could have seized it, would have worked to his substantial benefit and perhaps would have resulted in his avoiding prosecution altogether.

68.  There is no indication from the record that the State intentionally delayed bringing charges in order to harass Piñon or to gain some tactical advantage over him, nor that the delay was based on any consideration other than the provision of an opportunity for Piñon to cooperate with authorities and thereby gain concessions.  Piñon argues that he was "depriv[ed] . . . of the opportunity to obtain the testimony" of witnesses who would have supported his claims of entrapment.  He does not identify these witnesses, nor say what their testimony would have been.  He does not explain why the delay caused the witnesses to be unavailable.

69.  There may have been other, valid tactical reasons why these witnesses  should not have

testified, but the Court cannot make any determination on these matters as there is nothing on the record to show who the witnesses are and what they might have said.  Conclusory allegations are insufficient to show that a pretrial motion to dismiss the case for pre-indictment delay would, to a reasonable probability, have been successful.

b.  *Failure to enforce non-prosecution agreement*

70.  Piñon alleges that after he was arrested on the drug trafficking charges, members of the District Attorney's Office "promised him that they would not pursue criminal charges . . . so long as he truthfully told the police what he knew about drug trafficking in Hobbs, New Mexico." [Doc. 1, at 19].  He says that he agreed to cooperate and, despite his sincere efforts to assist the prosecution in its investigation into drug dealing, he was prosecuted.  He asserts that his attorney was ineffective in failing to pursue a motion to dismiss or to specifically enforce the promise not to prosecute.  [Id., at 19-20].

71.  Piñon raised this issue in his state habeas petition.  [Doc. 7, Ex. J, at 20-21].  The state habeas court rejected this claim, noting that although there were negotiations between Piñon's counsel and the District Attorney's Office regarding a non-prosecution agreement, "no meeting of the minds was achieved and no agreement was consummated.  There was no agreement to be enforced." [Doc. 7, Ex. Q, at 2].  The court further noted that, even if there were "some sort of informal understanding that the Defendant could 'work off' his charges, it is undisputed that Defendant did nothing to hold up his end of the bargain and hence there was a failure of consideration on his part." [Id.].

72.  The state court thus made findings that, first, there was no enforceable agreement and, second, that even if there had been, Piñon did not meet his obligations under the agreement.  Piñon

23

has failed to show that these findings were erroneous.  He presents only his unsupported assertion that the prosecution promised him that they would not pursue charges, even if he failed to assist them in their investigation.  Any motion to dismiss or to enforce a non-prosecution agreement would therefore have been futile.  It does not constitute ineffective assistance of counsel to fail to make a futile argument.  United States v. Cook, 45 F.3d 388, 393 (10th Cir. 1995).

73.  Piñon has failed to show that the state court's findings were erroneous or that its decision on this issue was unreasonable or contrary to federal law.

### c. *Failure to file motion to disclose confidential informant*

74.  Piñon next faults his attorney for failing to file a motion to disclose the identity of a confidential informant.  Piñon believes that the confidential informant was Ray Hernandez, and that disclosure of Hernandez "would have created more equilibrium in the evidence in this case."  [Doc. 1, at 21].  Piñon appears to be arguing that the jury would have made a favorable comparison between Hernandez, whom he describes as "an active drug dealer," and Piñon, who describes himself as "an innocent roofer" ensnared by Hernandez and the agents.  [Id.].

75.  This argument ignores the fact that Hernandez was on the scene at only one of the four drug purchases made by Piñon for the agents.  When Piñon raised this claim in his state habeas proceedings, the court noted this fact and concluded that Hernandez had "an insignificant involvement" in the series of drug deals.  The state court also noted that the identity of the informant was apparently known to Piñon all along and that, based on the evidence received on this issue, the Court would not have ordered disclosure of the confidential informant even if a motion had been filed by counsel.  [Doc. 7, Ex. Q, at 3].

76.  The decision of the state habeas court, rejecting the assertion of ineffective assistance on

24

this issue, was not unreasonable or contrary to federal law.  The government normally retains the privilege to withhold from disclosure the identity of persons who furnish information of violations of the law to police officers.  Roviaro v. United States, 353 U.S. 53, 60, 77 S. Ct. 623 (1957).  "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement . . . [and] maintain[ing] the Government's channels of communication by shielding the identity of an informer from those who would have cause to resent his conduct."  Id., 353 U.S. at 59, 60 n.8.

77.  This privilege will not be upheld, however, if disclosure of an informant's identity is essential to a fair determination of the case, for example where the informer "helped to set up the criminal occurrence and had played a prominent part in it," or where the informer "was the sole participant, other than the accused, in the transaction charged," or where the legality of a warrantless search is at issue and the communications of an informant are claimed to establish probable cause.  Roviaro, supra, 353 U.S. at 61, 64.  None of these circumstances is at issue here.

78.  Piñon has not presented anything to show that disclosure of any confidential informant's identity was essential to a fair determination of his case.  "[M]ere speculation about the usefulness of an informant's testimony is not sufficient."  United States v. Scafe, 822 F.2d 928, 933 (10th Cir. 1987).  Piñon's allegation that disclosure of Hernandez would have provided  "equilibrim in the evidence" constitutes mere speculation and does not support the claim that counsel was ineffective for not filing a motion to disclose the identity.

d.  *Failure to object to a deficient chain of custody*

79.  Piñon next claims that trial counsel was ineffective in failing to file a motion seeking to exclude the crack cocaine from evidence for deficient chain of custody.

80. Piñon asserts that there is no record at all as to when two samples of the suspected crack cocaine from of the purchases on September 12 and 17, 2001 were sent to the crime lab for analysis. As to the other two purchases, Piñon alleges that although Agent Nick Jimenez claims he seized two large rocks of suspected crack cocaine on September 13, 2001, he did not send the evidence to the crime lab for analysis until November 1, 2001, and that Agents Jimenez and Moyers seized crack cocaine on September 20, 2001 but did not send it to the lab until March 20, 2002.  [Doc. 1, at 22].

81. Piñon argues that the testimony of the police officers was insufficient to establish with a reasonable certainty that the evidence admitted at trial was the same as the evidence allegedly taken from Piñon, nor that the evidence was free from tampering.  He claims that the parties disagreed concerning the amount purchased and supplied.  He asserts further that the officers acknowledged that the evidence remained in their exclusive possession, without any evidentiary protections, for periods ranging from one and half to six months.  This delay, he argues, was excessive and broke the chain of custody required to ensure that the evidence was free from tampering.  He faults his attorney for failing to object to an inadequate chain of custody.  [Doc. 1, at 22-23].

82. Piñon raised this claim in the state habeas proceedings.  [Doc. 7, ex. J, at 23-24].  The state habeas court rejected it on grounds that counsel did in fact raise the chain of custody issue at trial, in the form of cross-examination of the agents, and that the trial court made a finding that this testimony established sufficient chain of custody to allow admission of the evidence.  [Doc. 7, Ex. Q, at 3].  Although it might have been better practice if counsel had filed a pretrial motion challenging chain of custody, it was not unreasonable for the state habeas court to conclude that counsel's failure to do so did not constitute ineffective assistance since there was, in fact, sufficient chain of custody evidence and any such motion would have failed if it had been brought.  As noted above, it does not

constitute ineffective assistance to fail to raise a meritless argument.  Piñon has not met his burden

on this issue of showing the state court's decision was unreasonable.

### e. *Failure to interpose Batson objection*

83.  Piñon next asserts that trial counsel was ineffective for failing to make timely objections

to the prosecution's allegedly racially discriminatory use of peremptory challenges, under the rule of

Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986).

84.  Piñon, who is Hispanic, argues that the State in this case used all three of its peremptory

challenges to exclude Hispanic jurors, with the result that the jury included only five Hispanic-

surnamed jurors.  He says there was "nothing distinctive" about the three Hispanic jurors who were

stricken by the State, and their *voir dire* responses did not materially differ from the responses of

other jurors who were ultimately seated.  [Doc. 1, at 23-25].  He argues that counsel should have

challenged the State to provide a racially-neutral explanation for exclusion of these potential jurors.

85.  Piñon raised this argument in his state habeas petition.  [Doc. 7, Ex. J at 24-28].  The

state habeas court rejected the argument, noting as follows:

> The State exercised only two of its pre-emptory challenges in seating
> the twelve jurors who decided the case.  After eleven jurors were
> seated over all, including four with Hispanic surnames, the State
> struck serviceman Amanda Parras and then Donald Rhinehart before
> the twelfth juror was seated.  Counsel [for the defendant] explained
> that he was out of pre-emptory challenges himself and was not at all
> opposed to the State excluding those jurors.  Counsel noted that his
> pre-trial investigation of the venire revealed that both had ties to law
> enforcement that Counsel found objectionable.  Counsel's decisions
> not to make Batson challenges were reasonable, tactical decisions.

[Doc. 7, Ex. Q at 3].

86.  This decision by the state court was not unreasonable nor contrary to federal law.  The

state judge's opinion, the factual basis of which Piñon does not challenge, establishes that of the four peremptory challenges exercised by the State, at least one was used to exclude a non-Hispanic surnamed individual (Mr. Rhinehart), and that the State allowed four Hispanic-surnamed jurors to pass without challenge.

87.   Petitioner in <u>Batson</u> was African-American.   The prosecution in that case used its peremptory challenges to strike the only four black persons on the venire panel, with the result that the jury that convicted Batson was all white.   It is a clear constitutional violation when the State places a person on trial with a jury from whom members of the defendant's race have been purposefully excluded.   The Supreme Court held in <u>Batson</u> that the defendant has the burden of proving purposeful discrimination.   He or she may do so by pointing to whatever "circumstantial and direct evidence of intent as may be available."   <u>Batson v. Kentucky</u>, *supra*, 476 U.S. at 93.   The "totality of the relevant  facts" must give rise to an inference of discriminatory purpose.   Once the defendant has made that showing, the burden shifts to the State to adequately explain the racial exclusion.   <u>Id.</u>, at 94.

88.   In this case, the state habeas court found, in essence, that Piñon could not meet his initial burden of proving purposeful discrimination.   The "totality of the relevant facts" includes the circumstances that the State did in fact permit four Hispanic-surnamed jurors to be seated, and that the State also used at least one of its peremptory challenges to exclude a non Hispanic-surnamed person.   Defense counsel did not object to the peremptory exclusion of at least one of the Hispanic-surnamed persons on the venire panel, based on that person's connection with law enforcement.

89.   It was reasonable for the state habeas court to conclude that Piñon failed to establish that the State's challenges were done with a purpose to discriminate.   In his federal habeas petition, Piñon

does not point to any evidence on the record which would support his assertion that the prosecution engaged in purposeful discrimination.  He claims that the *voir dire* responses of the Hispanic-surnamed jurors who were excluded were similar to those of non-Hispanics, but he does not provide transcript references or give any details as to what those responses were.  Overall, the circumstances indicate that race was not a factor in jury selection. Mere allegations of racial discrimination do not suffice to satisfy Piñon's burden of proof in this matter, and such unsupported allegations would not have provided a basis for <u>Batson</u> challenges at trial.

90.  The Court finds no grounds for federal habeas relief on the claim of ineffective assistance in failing to raise a <u>Batson</u> claim.

<u>Refusal to Allow Defendant to Testify</u>

91.  Piñon next alleges that he repeatedly told his attorney that he wanted to testify and explain to the jury how he was entrapped by law enforcement agents into selling drugs.  He asserts that his attorney would not allow him to testify and "counsel alone chose to prevent this testimony." [Doc. 1, at 27-28].  Piñon raised this identical argument in his state habeas petition.  [Doc. 7, Ex. J, at 30].

92.  In its opinion, the state habeas court made the factual finding that Piñon was not forbidden to testify, but rather that he himself elected not to testify.  The trial judge advised Piñon on the morning of trial that he had the right to testify, or not, as he chose.  At the close of the State's evidence, after being informed again by the trial judge of his right to testify, Piñon told the court that he elected not to testify.  [Doc. 7, Ex. Q, at 1].

93.  This is a finding of fact and, as noted above, this Court will accept it unless Piñon can show by clear and convincing evidence that it was erroneous.  28 U.S.C. § 2254(e)(1).  Piñon has not

done so.  He merely asserts that he consistently told his attorney that he wanted to testify.  However, he told the court at the time of trial just the opposite.  "Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal . . . ."  Blackledge v. Allison, 431 U.S. 63, 74, 97 S. Ct. 1621 (1977).

94.  In addition to noting Piñon's statement to the court at trial, the state habeas court also explained why it would have been poor trial strategy, and prejudicial to the defense, for Piñon to testify.  The state court noted that, if Piñon had elected to testify his requested jury instruction on subjective entrapment would have been given; however, in that event the prosecution could also have impeached him with evidence of his prior felony conviction, a conviction which "clearly involved deceit and dishonesty."  [Doc. 7, Ex. Q. at 2].  Indeed, it has been held to be ineffective assistance when counsel presents a witness who opens the door to testimony about a defendant's past convictions.  Miller v. Anderson, 255 F.3d 455, 458 (7th Cir. 2001), *later vacated by agreement of the parties pending rehearing*, 268 F.3d 485 (7th Cir. 2001).

95.  Piñon's attorney attempted to eliminate this problem by filing a pretrial motion *in limine*, seeking to prevent impeachment by prior felony conviction.  The trial court denied the motion, finding that the prior conviction would be competent and proper impeachment evidence if Piñon took the stand.  There is no allegation that counsel was ineffective in the manner in which he presented the arguments in the motion *in limine*; Piñon simply lost that motion on the merits and on the law.

96.  The state habeas court thus made the factual finding, based on Piñon's statement in open court after advisement of his right, that he made the choice of his own free will not to testify.  And the court implicitly found further that, even if his attorney had counseled or convinced Piñon not to

30

testify, this was sound advice in light of the prior conviction, and did not prejudice Piñon's defense. Piñon has not met his burden of showing that the state court's finding was erroneous, nor that its conclusion was unreasonable in light of federal law.

97.  There is no ground for federal habeas relief on the issue of failure to testify.

Cumulative Error

98.  Finally, Piñon alleges cumulative error.  The cumulative error analysis requires the Court to examine the cumulative effect of any individually harmless errors it has found in counsel's conduct of the case.  United States v. Rosario-Fuentez, 231 F.3d 700, 709 (10th Cir. 2000).  If no error was found, there can be no cumulative error.  "[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors."  United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990).

99.  Piñon raised the cumulative error issue in his state habeas petition.  [Doc. 7, Ex. J, at 31-32].  The state habeas court found no error with respect to any of the claims raised by Piñon and, as discussed above, this Court finds that the state court rulings were reasonable and in conformity with federal law.  The cumulative error claim is rejected.

**Recommended Disposition**

That Respondent's Motion to Dismiss [Doc. 4] be granted, and that the Petition be denied and the case dismissed with prejudice.

Lorenzo F. Garcia
Chief United States Magistrate Judge